IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 23, 2019

**JUAN JOSE REYES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for DeKalb County**
**No. 2013-CR-99     David A. Patterson, Judge**

_____

**No. M2018-01075-CCA-R3-PC**

_____

Petitioner, Juan Jose Reyes, was convicted by a jury for the offense of rape of a child and received a sentence of thirty-two years. He appeals the denial of his petition for post-conviction relief in which he alleged ineffective assistance of counsel at trial. After a thorough review of the record, we conclude that Petitioner has failed to show that his trial counsel rendered ineffective assistance of counsel, and we accordingly affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Brandon J. Cox, Smithville, Tennessee, for the appellant, Juan Jose Reyes.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Stephanie Johnson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

The facts of this case as set forth by this court on direct appeal are as follows:

[Petitioner] was convicted of raping the victim, who was 10 years old at the time of the trial and had been spending the night with [Petitioner] when the offense occurred.

The victim's grandmother testified as the first witness, saying that she had a close relationship with him and would "spoil him every chance [she] got." In November 2012, he was living alternately with her and with his mother, as well as with "friends." Once or twice a month, as well as on weekends, he would stay with a "long-time family friend," from whom [Petitioner] rented a room. In March 2013, [Petitioner] moved from the friend's residence, apparently to live with some of his friends in a trailer and, later, to a house next to it.

She said that the victim and [Petitioner] were "good friends," and the victim continued to spend several nights per week, as well as weekends, at [Petitioner's] new residence. Following a conversation she had with the victim, she became "very upset" and "confronted" [Petitioner]. She said that she does not speak Spanish and, thus, questioned him in English regarding what the victim had told her. He "denied it and he cried and he begged and said he would never hurt him. And I told him but you did." The following day, the victim's mother took him to the sheriff's department and met with Detective Mike Billings, who began investigating the matter.

On cross-examination, the victim's grandmother said that the victim had been staying with [Petitioner], in this fashion, for several months and seemed to be happy.

The victim testified that presently he was 10 years old. From November 2012 through March 2013, he was staying, alternately, at his grandmother's house and at that of his aunt, where [Petitioner] also lived. He said that he spoke "[a] little" Spanish, conversed with [Petitioner] in English, and was understood by [Petitioner]. He said that when he was with [Petitioner] in [Petitioner]'s bedroom, [Petitioner] "[s]tuck his privates in my butt." The victim said that [Petitioner] touched him "skin to skin" and did not touch him anywhere else. This happened around the first of 2013, and he told his grandmother, although not right after it had happened. The victim explained that he was referring to [Petitioner's] penis when he talked about his "privates."

On cross-examination, the victim said that, although he had not bled after the incident, he had a "really bad pain." He said he did not return to stay with [Petitioner] after this happened and had not seen him since then.

Sheriff Patrick Ray, of the DeKalb County Sheriff's Office, testified that [Petitioner] was being housed in the county jail. When he spoke with

[Petitioner], he did so in English; Sheriff Ray said he could not speak Spanish.

Detective Mike Billings said he had worked in law enforcement for approximately 20 years and had formerly worked for Sheriff Ray. He said that the victim and his mother had come to the Sheriff's office on March 6, 2013, where he met with them. He called the Department of Children's Services, and, along with one of its representatives, met with the victim and his mother. Later that day, he went to [Petitioner's] residence, where [Petitioner] answered the door, saying to him, "I know why you're here, you're here because of [the victim]." [Petitioner] told Detective Billings that he knew there were "some allegations made against him that he had raped [the victim]." [Petitioner] gave permission for his residence to be searched and, afterwards, Detective Billings took him to the sheriff's office for an interview. He spoke English to [Petitioner], who responded in English. He said that the sheriff's department could summon interpreters to talk with non-English speakers, but he did not need one in speaking with [Petitioner] because each understood the other. He advised [Petitioner] of his <u>Miranda</u> rights, and [Petitioner] waived them in writing. Detective Billings asked if [Petitioner] wanted to write out his statement, and he responded that he would rather have Detective Billings do so. Detective Billings then proceeded to write exactly what [Petitioner] told him, and, after finishing, read the statement to [Petitioner] and asked if there were any additions or deletions to be made. [Petitioner] responded that there were not and signed the statement. As read aloud by Detective Billings, [Petitioner] had told him:

I have lived in DeKalb County for about seven years and about four months ago I met [the victim]. And he would want to come to my house and stay all night with me on the weekends [the victim] had stayed at my house about twenty times and sometimes he would sleep with me and most of the time we both slept in our boxers. There was two times he would try to get in the bed naked and I told that is not right and sometimes he would put them on and sometimes he would just jump under the covers naked.

Sometimes I could smell him and I would make him take a shower and I would stand by the door and he would try and spray water on me at my face, but it wouldn't make me mad.

It has been a month since I had sex and it was with a girl from the bar I met. I do know Tina Young was over there at my house one

- 3 -

night or two and we had sex. I don't remember if [the victim] saw us or not. Sometimes when we was driving down the road, [the victim] would say stuff like my penis is hard and I would tell him to shut up and sometimes he would ask if I would take him to the strip club, but I told him he could not go.

One time I was in the living room watching TV and (sic) came out of my room and he said come look and he had a hard on. And I said what, what the hell are you doing and he said he played Grand Theft Auto game and it was giving him a hard on.

I never raped [the victim], but one time I was high that day and he wanted me to do it. I told him a thousand times not to, but he kept on asking and saying please get frisky. I told him it's not right. He promised if I did this he wouldn't let anyone else try it. We was lying down and I put a condom on, but I didn't stick it all the way in, just rubbed it on him twice. I wish I didn't do it, I was just fucked up in the head and I would never do anything to hurt [the victim]. Signed by [Petitioner].

Detective Billings further testified that he had collected from [Petitioner's] residence "condoms, unopened condoms, condoms under the bed, porno movies."

Following the testimony of Detective Billings, the State rested its case-in-chief, and [Petitioner] then did likewise, without presenting proof.

*State v. Reyes*, 505 S.W.3d 890, 893-95 (Tenn. Crim. App. 2016).

*Post-Conviction Hearing*

Trial counsel testified that she was employed by the public defender's office and had been licensed to practice law since 2007. She was appointed to represent Petitioner on March 14, 2013, in general sessions court. Trial counsel testified that she told Petitioner that he could have a preliminary hearing, but she "had [an] understanding of what the D.A. had told [her], which was just the testimony of the detective in the case and [she] explained that to [Petitioner] and explained that [she] didn't know how helpful that would be because that would all be included in discovery in the Criminal Court." Trial counsel did not recall Petitioner mentioning any witnesses or evidence at that point. She testified that the preliminary hearing was then waived.

Trial counsel testified that Defendant was indicted on a three count indictment during the April term of the grand jury for 2013, and he was arraigned on April 8, 2013.

- 4 -

She was again appointed to represent him in criminal court. A superseding indictment was issued narrowing the time-frame for the offenses. Trial counsel testified that she filed a motion for discovery, and she received discovery from the State. She testified: "We received [Petitioner]'s statement, we received police reports, Child Advocacy Center interview, I mean various other things, but that, that was the bulk of it." Trial counsel met with Petitioner to review discovery, and she had an interpreter with her. Bob Lynch, an investigator with the public defender's office, also met with Petitioner and reviewed the victim's interview with him. Trial counsel answered any questions and addressed any concerns that Petitioner had. Trial counsel noted that she and co-counsel, another member of the public defender's office, met with Petitioner multiple times and always with an interpreter.

Trial counsel agreed that she filed a motion for specific discovery nearly one year after Petitioner was arraigned requesting any and all HIV testing results of the victim. The request related to Defendant's charge of criminal exposure to HIV. Trial counsel did not recall the State providing to Petitioner anything related to the request and the criminal exposure charge was eventually dismissed by the State. She did not take any further steps to obtain the victim's medical history or medical exams because she believed that the records were no longer relevant. Trial counsel told Petitioner why she thought it was unnecessary to obtain the victim's medical records. She testified that Petitioner believed the victim's medical records would be helpful to his defense if they showed that the victim did not have a sexually transmitted disease. Trial counsel testified that she and co-counsel filed a motion in limine to exclude any proof of Petitioner being HIV positive because they felt that "any mention of that particular allegation because we, [co-counsel] and I, felt like that would be more prejudicial to him than, than it coming out that that had been alleged at all."

Trial counsel also filed a motion for specific discovery of the victim's Department of Children's Services (DCS) records. Those records were produced for in-camera review, and trial counsel was able to review the records after the in-camera review. Trial counsel did not find anything useful in the records. On February 12, 2014, trial counsel filed a motion for a bill of particulars and a subsequent motion for a bill of particulars was filed on May 23, 2014. She said that the purpose of filing the motions was to "get specific information about the allegations before the trial started and to make sure that we were defending against the correct allegations." The State responded to the motions for a bill of particulars on June 20, 2014, approximately eleven days before the trial, and identified "the alleged event [that] occurred, where it occurred, and some other specifics about that[.]" Trial counsel believed that gave her enough time to prepare a defense based upon the answer that she had received from the State. Trial counsel could not specifically remember reviewing the State's response with Petitioner but she was sure "that we did." Several motions in limine were also filed in Petitioner's case. Trial counsel testified: "I had filed them as a result of speaking with him about the allegations

that had been made in the discovery and his denial of those, so we filed the motions in limine for those not to be, those allegations not to be mentioned."

Trial counsel said that Petitioner provided her with the names of Tiffany Perrigan, Rudolpho Reyes, and Tina Young as individuals that Petitioner thought would be helpful at trial. Trial counsel did not recall that Petitioner articulated why the individuals would be helpful to his case. She testified: "I talked with him a decent amount about the witnesses, but I don't remember having a clear understanding of exactly what those individuals would testify to or what he believed they would testify to." Trial counsel noted that she filed a motion to continue the day before trial because Petitioner provided the names of the potential witnesses very close to the trial date, and an investigator from the public defender's office had tried to locate the witnesses but was unable to do so. Therefore, they requested additional time to locate the witnesses. Trial counsel could not recall for certain when Petitioner gave her any information on the potential witnesses. She testified that the investigator "went out and physically tried to locate these people. In addition to that, I remember that the jail allowed me to access (Petitioner's) cell phone and I had told him that they were going to do that, and so I was able to look through this phone and try to find numbers." Trial counsel did not find the phone numbers for Tiffany Perrigan, Tina Young, or Rudolpho Reyes in Petitioner's phone. Trial counsel testified that she realized the day before trial that she would not be able to find the witnesses.

Trial counsel recalled that Petitioner wanted her to investigate the victim's behavior at school. She said, "I think [Petitioner] felt like [the victim] had maybe lied at school or done some things at school that would indicate that maybe he wasn't honest and [Petitioner] thought that was relevant to the allegations in this case." Trial counsel testified that she did not talk to anyone at the school about the victim's behavior because she did not think that it was relevant to what would happen at trial. She said:

> And with a witness that age, I don't know how effective it would have been to have tried to impeach him with maybe small things at school or even if we could have gotten a teacher who would have said that he had lied about anything. I don't know that that would have changed how the jury viewed his testimony at trial.

Trial counsel could not recall any specific examples that Petitioner gave her to challenge the victim's credibility.

Trial counsel testified that she received the victim's interview from the Child Advocacy Center (CAC). She did not recall if the victim mentioned Tiffany Perrigan's name during the interview. Trial counsel did not feel that it would have been beneficial to impeach the victim or use the CAC interview in any manner because she did not think that what the victim "said at trial was in direct conflict with what he said in the

interview." Trial counsel did not feel that the victim "was as specific at trial as he had been with the child advocacy interview," which she argued at trial.

Trial counsel thought that she and co-counsel talked with Petitioner before trial about his right to testify. She testified: "We spent a good amount of time once the [S]tate rested talking to him about his right to testify or right not to testify and how that was his decision. We spent a good amount of time, I remember that discussion specifically." Trial counsel had a "pretty good idea" of what Petitioner's testimony was going to be. Trial counsel said that she and co-counsel had an interpreter during the discussion with Petitioner. Trial counsel testified that her biggest concern with Petitioner testifying at trial "was the potential that the [S]tate might impeach him with the statement he had made to Detective Billings." She agreed that the statement was already part of the record.

Trial counsel testified that the defense strategy in Petitioner's case was to "get the jury to believe that this was more of a touching situation than a penetration." She based the defense on the victim's testimony. There were no eyewitnesses to the offense. Trial counsel testified that Petitioner was scheduled to enter a guilty plea prior to trial to a lesser offense. Trial counsel and co-counsel explained the potential sentence that Petitioner face by going to trial, and he seemed to understand. They had an interpreter present during the discussion.

On cross-examination, trial counsel testified that she had handled other sexual assault, and rape cases during her employment with the public defender's office. She did not recall Petitioner mentioning any witnesses when she began representing him in general sessions court. Trial counsel met with Petitioner in general sessions court and at the jail. Trial counsel did not have any difficulty communicating with Petitioner as long as an interpreter was present. There was one meeting with Petitioner during which an interpreter was not present. Trial counsel and co-counsel always made sure that Petitioner understood what they were talking about, and they asked if he had any other questions. Trial counsel said, "We would explain things about the process, so I felt like he had the opportunity to ask questions." She never had any concerns during her interactions with Petitioner.

Trial counsel testified that Petitioner agreed to waive the preliminary hearing. She knew what the State's proof would be at that point, and Petitioner waived the hearing based on her recommendation. Petitioner's case was moved to criminal court, and trial counsel filed seven motions, including motions in limine, motions for specific discovery, and a motion to suppress petitioner's statement. There were no statements provided in discovery from Ms. Perrigan, Rudolpho Reyes, or Ms. Young. Trial counsel testified that Petitioner did not provide the addresses or phone numbers for Ms. Perrigan, Rudolpho Reyes, or Ms. Young, and she had no specific information about the witnesses. Trial counsel testified that the only information that Petitioner provided were the directions to someone's house, but Mr. Lynch was not able to find the person they were looking for.

Trial counsel noted that Mr. Lynch made at least two or three attempts to locate Ms. Perrigan, Rudolpho Reyes, and Ms. Young but he was unable to do so. No subpoenas were issued for the individuals because Petitioner did not have adequate information to locate them. Trial counsel filed a motion to continue on the day of the trial which was denied by the trial court. She noted that the reasoning for the motion was "[j]ust that we had information about potential witnesses, that especially due to the nature of the charges, you know, we wanted to investigate everything we can and Mr. Lynch needed more time to try [to] find them."

Trial counsel agreed that she made a tactical decision about the impeachment of the victim, and they were successful in having the exposure to HIV count dismissed by the State. Trial counsel recalled that the State made a plea offer of "two counts of aggravated sexual battery, ten years to serve on each consecutive for an effective twenty year sentence." She and Petitioner discussed the "pros and cons" of going to trial, and she recommended that Petitioner accept the plea offer. He initially agreed but then refused to accept the plea. Trial counsel agreed that the trial strategy became to have the jury come back with a finding of battery or a touching as opposed to penetration. This strategy was based on the victim's testimony. Trial counsel noted that she attempted to impeach the victim, who was approximately ten years old, "with how he described the confrontation at trial." Concerning her strategy in dealing with the victim, trial counsel testified:

> Well he, he actually testified at trial that [Petitioner's] private touched his private and so on cross examination I got him to again say that and I argued to the jury that that was touching and not penetration, which they did not, obviously did not believe.

Trial counsel agreed that cross-examining a child witness is a very sensitive position to be in with a jury. She noted that Petitioner did not testify at trial. Concerning his testimony, trial counsel testified:

> Based on our conversations with [Petitioner] throughout the case, I was concerned about him being impeached with the statements that he had made to Detective Billings. I was concerned about how the jury, the jury would view what he would say at trial versus what he has allegedly said to Detective Billings.

Trial counsel testified that Defendant admitted to Detective Billings that he raped the victim. On re-direct examination, trial counsel testified that she did not believe that anything at trial would have changed if Ms. Perrigan, Rudolpho Reyes, or Ms. Young had testified at trial.

- 8 -

Petitioner testified that he met with trial counsel when he was in general sessions court for "[f]ive or ten minutes before the court." He said that an interpreter was not present for all of the meetings. He agreed that he sometimes met with trial counsel at the jail. Petitioner testified that he initially did not have addresses for Ms. Perrigan, Rudolpho Reyes, and Ms. Young. He said that he told trial counsel to get the addresses from Tim Dover, who was Petitioner's "boss." Petitioner admitted that he did not have an address for Mr. Dover, and he told trial counsel that Mr. Dover was a contractor and that his wife owned a barber shop. Petitioner testified that he later obtained an address in McMinnville for Ms. Perrigan and gave it to trial counsel. He said that trial counsel mentioned going to the address. Petitioner testified that he asked post-conviction counsel to subpoena Ms. Perrigan and Rudolpho Reyes. He noted he had been told that Ms. Young had passed away. Petitioner said that Rudolpho Reyes lived at the address that he gave post-conviction counsel. He also said that he had other information concerning Ruldopho Reyes if he was unable to be located at the address because "[a]ll these people are related as family friends." Ms. Perrigan was served with a subpoena for the post-conviction hearing.

Petitioner testified that he spoke with trial counsel concerning the victim's teachers and school records, and she did not think they would be helpful. He wanted trial counsel to obtain the records. Petitioner testified:

> Because when we were in, in the court, the [victim] said that he was hurt and that he couldn't do anything. And so you could review those records of the school and see that he was able to do things.

> You can look at a school and the day that I supposedly did this, he was at school. I thought that could be really important, because he didn't have anything wrong with him. I thought the teacher could talk about his behavior.

Petitioner testified that he wanted trial counsel to also investigate the victim's mother because the victim had told him things that his mother and her boyfriend would do in the victim's presence. He said that trial counsel told him that those things would not help his case.

Petitioner testified that he wanted trial counsel to obtain the victim's medical records because he thought it would help his case, and "I told her that I hadn't done what I was accused of." Petitioner testified that he also wanted trial counsel to introduce his medical history. They also discussed the potential risks of introducing the history at trial. He said: "She told me it was going to be bad."

Concerning the motion to continue, Petitioner testified that he told trial counsel about the potential witnesses the first time that they met. He said that he gave her the

address for one of them. Petitioner testified that trial counsel told him approximately one month before trial that she was having difficulty locating the witnesses. He said that he specifically told trial counsel what the witnesses' testimony would be. Petitioner testified that Ms. Young would have testified that he did not force the victim to watch him have sexual relations with Ms. Young. He said that Rudolpho Reyes would have testified the victim said that it was "easy to send a person to prison."

Petitioner testified that he spoke with trial counsel about the medical proof in the case. He said that trial counsel evaded the issue and said that medical records were not necessary but she did not explain why. When asked why he wanted the medical proof introduced at trial, Petitioner replied: "It would have been different, probably they wouldn't have found me guilty." He also said that the medical records would have shown that everything the victim said was a lie because the victim indicated that he was hurt and could not do anything or go to school. Petitioner testified that he discussed his concerns about the medical records each time that he met with trial counsel. To his knowledge, trial counsel never attempted to obtain the records.

On cross-examination, Petitioner agreed that trial counsel met with him on many occasions, and she did not have an interpreter for their first meeting. He also agreed that he had the assistance of two attorneys in his case. Petitioner testified that he had known Ruldopho Reyes and Ms. Perrigan for approximately fifteen years, and he had known Ms. Young for ten years. He did not have their phone numbers because "[i]t's really hard to have a telephone number when they change their numbers frequently." Petitioner testified that trial counsel did not review his cell phone with him. Petitioner said that he was not familiar with Ms. Young's extensive criminal history but he was aware that she "would take a lot of drugs and whatever there was." He admitted that there were no witnesses present at the time of the offense. Petitioner denied raping the victim. Petitioner agreed that many motions were filed in his case. However, Petitioner felt that a "petition" to bring in the medical proof should have been filed. Concerning trial counsel, Petitioner testified: "First, everything that she says is a lie. Everything that she was doing was pressuring me to plead guilty. And I was at the point of doing that. That's everything." Petitioner also said that he did not tell Detective Billings that he sexually penetrated the victim. He chose not to testify at trial based on the advice of trial counsel. Petitioner agreed that he was HIV positive and that trial counsel was successful in getting the criminal exposure to HIV charge dismissed.

Tiffany Perrigan testified that Petitioner's cousin, Aldopho Reyes, was her former stepfather, and she has known Petitioner for eighteen years. She did not have much contact with Petitioner prior to his incarceration. At the time of Petitioner's arrest, Ms. Perrigan was living with her boyfriend's mother on Anthony Avenue in Smithville, Tennessee. She previously lived with her mother in McMinnville, Tennessee. Ms. Perrigan testified that Petitioner sometimes picked her up in Smithville and drove her to her mother's house. She said that she never dated Petitioner or had sexual relations with

him. Ms. Perrigan testified that no one stopped by the address in Smithville to ask any questions or serve her any papers. She did not know the victim, and she had seen one child with Petitioner who had blond hair and wore glasses. She did not know the child's name or his mother. Ms. Perrigan testified that Rudolpho Reyes lived at her mother's house at one point. When Ms. Perrigan asked an acquaintance for Rudolpho Reyes' telephone number, she was informed that Rudopho Reyes did not want to be involved in Petitioner's case and did not know anything. Ms. Perrigan testified that she never observed Petitioner mistreating any child, and the victim never observed her and Petitioner have sexual relations.

*Analysis*

Petitioner argues that trial counsel was ineffective for failing to adequately investigate and prepare for his case and failing to call any witnesses to testify at trial. He further contends that the cumulative effect of the alleged deficiencies in trial counsel's performance prevented him from receiving a fair trial.

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn.1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of trial counsel. In order to sustain a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under the two prong test established by *Strickland*, 466 U.S. at 687, a petitioner must prove that trial counsel's performance was deficient and that deficiency prejudiced the defense. *See Burnett v. State*, 92 S.W.3d 403, 408 (Tenn. 2002). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

The test for deficient performance is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. To be considered deficient, counsel's acts or omissions must fall below an objective standard of reasonableness under prevailing professional norms. *Id.*; *Henley*, 960 S.W.2d at 579.

This court "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). This court will not use hindsight to second-guess a reasonably-based trial strategy. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of trial counsel, however, is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Prejudice is shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694).

Whether a petitioner has been denied the effective assistance of trial counsel presents a mixed question of law and fact. *Burns*, 6 S.W.3d at 461. This court will review the post-conviction court's findings of fact "under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley*, 960 S.W.2d at 578). This court will not re-weigh or re-evaluate the evidence presented or substitute our own inferences for those drawn by the trial court. *Henley*, 960 S.W.2d at 579. Questions concerning witness credibility, the weight and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court. *Momon*, 18 S.W.3d at 156 (citing *Henley*, 960 S.W.2d at 578). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields*, 40 S.W.3d at 458.

First, Petitioner argues that trial counsel failed to adequately investigate and prepare for his case. More specifically, he contends that "[w]hile the exact number of total meetings is unclear, it appears that [t]rial [c]ounsel met with Appellant at the DeKalb County Jail one (1) time prior to the scheduled preliminary hearing[,]" and no interpreter was present for the first "encounter" between Petitioner and trial counsel and that the "only other meeting prior to the preliminary hearing on this case was at Court the date of the preliminary hearing[,]" during which an interpreter was present. We note that trial counsel testified that Bob Lynch, an investigator with the public defender's office, met with Petitioner and reviewed the victim's interview with him. Trial counsel answered any questions and addressed any concerns that Petitioner had. Trial counsel testified that she and co-counsel, another member of the public defender's office, met with Petitioner multiple times and always with an interpreter.

Petitioner asserts that at the first meeting, the decision was made to waive the preliminary hearing. He argues that trial counsel knew the benefit of having a preliminary hearing but made the decision in Petitioner's case to waive it anyway. Concerning the investigation of Petitioner's case by trial counsel, the post-conviction court found:

The Petitioner complains that his trial counsel was ineffective for failing to properly investigate the case prior to trial. The Court has considered the transcript, considered the record, and considered the complaints as testified to by the Petitioner. The Court finds no fault with the investigation conducted by the Petitioner's attorney. This issue is without merit.

Trial counsel testified that she told Petitioner that he could have a preliminary hearing. However, she had an understanding of the case based upon what the prosecutor had told her. The State's case at a preliminary hearing would have consisted only of the testimony of Detective Billings who investigated the case. Trial counsel explained that to Petitioner, and she explained that she did know how helpful it would be to have a preliminary hearing "because that would all be included in discovery in the Criminal Court." The preliminary hearing was then waived. Petitioner has not shown that the decision to waive the preliminary hearing prejudiced him in any way. Petitioner in his brief does not identify any proof that would have been presented at the preliminary hearing that was not provided to trial counsel in discovery. *See, e.g. Jamie Bailey v. State*, No. W2008-00983-CCA-R3-PC, 2010 WL 1730011, at *6 (Tenn. Crim. App. April 29, 2010) (concluding that trial counsel "offered a reasonable explanation for his decision not to pursue a preliminary hearing, testifying that . . . the State had an open-file discovery"). Furthermore, Petitioner did not offer such proof at the post-conviction hearing. The evidence reflects that trial counsel made a strategic decision based on information that she had at the time to waive the preliminary hearing. There is no evidence that waiver of the preliminary hearing affected the outcome of Petitioner's trial in any way. *See Paul David Childs v. State*, No. W2015-00994-CCA-R3-PC, 2016 WL 1745270, at *7 (Tenn. Crim. App. April 28, 2016). Petitioner is not entitled to relief on this issue.

Next, Petitioner contends that trial counsel rendered ineffective assistance of counsel by failing to request his and the victim's medical records. He notes that trial counsel filed a motion for discovery early on in his case but that trial counsel "failed to follow up with a motion for a bill of particulars or any other requests until over one (1) year after Appellant was arraigned." Petitioner states that trial counsel made a specific request concerning the victim's medical records but failed to "follow up and enforce such a request, even though her client was still urging her to obtain said records." He asserts that these records "would have been helpful to disprove the alleged conduct and to show that the alleged victim was not telling the truth." Concerning this issue, the post-conviction court found: "The Petitioner complains that his trial counsel is ineffective for failing to present his, and the victim's, medical records. The Court finds that the Petitioner has failed to show how these medical records would have been of benefit to the Petitioner in his defense. This issue is without merit."

- 13 -

Trial counsel testified that she filed a motion for specific discovery nearly one year after Petitioner was arraigned which requested any and all HIV testing results of the victim. This request related to the charge against Petitioner of criminal exposure to HIV. Trial counsel did not recall receiving anything related to the request from the State, and the criminal exposure to HIV charge was eventually dismissed by the State. Trial counsel did not take any further steps to obtain the victim's medical history or exams because she believed that the records were no longer relevant to Petitioner's case. She gave Petitioner an explanation as to why she thought the medical records were unnecessary. As for Petitioner's medical records, trial counsel testified that she and co-counsel filed a motion in limine to exclude any proof of Petitioner being HIV positive because they felt that "any mention of that particular allegation because we, [co-counsel] and I, felt like that would be more prejudicial to him than, than it coming out that that had been alleged at all." We find that trial counsel made a strategic decision not to obtain the victim's or Petitioner's medical records and introduce them at trial. It is not the function of this court to "second guess" tactical and strategic choices pertaining to defense matters if the choices are informed ones based upon adequate preparation. *See Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995); *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982); and *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

Furthermore, Petitioner has not demonstrated that he was prejudiced by trial counsel's failure to obtain the medical records. Petitioner did not introduce any evidence at the post-conviction hearing to support this allegation. As pointed out by the State, the victim was not examined by a doctor nor did he seek medical treatment because of the rape. Also, the State did not offer any medical evidence against Petitioner at trial. Petitioner is not entitled to relief on this issue.

Petitioner briefly argues that trial counsel was ineffective for failing to develop and adequately prepare a defense. Petitioner states in his brief: "The Trial Counsel's expressed trial strategy appeared to evolve into a strategy of hoping the jury would find the Appellant guilty of a lesser included offense, mainly because of the testimony of the alleged victim at the trial of the case." Petitioner has failed to show that the strategy employed by trial counsel was not entitled to deference. The State's case rested on the victim's credibility. Trial counsel testified that the defense strategy in Petitioner's case was to "get the jury to believe that this was more of a touching situation than a penetration." She based the defense on the victim's testimony at trial that Petitioner's private touched his private part and that the contact was "skin to skin." There were no eyewitnesses to the offense, and Petitioner had told Detective Billings that he had sexual contact with the victim. In light of the victim's testimony and Petitioner's admission to Detective Billings, it was not unreasonable for trial counsel to argue that no penetration occurred and that Petitioner should have been convicted of a lesser offense. Trial counsel's strategy was based on an informed and thorough preparation of the case, "[t]he fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn.

1996). Petitioner did not offer an alternative trial strategy at the post-conviction hearing nor has he shown by clear and convincing evidence that trial counsel's performance in this area was deficient.

Finally, Petitioner argues that trial counsel was ineffective for failing to call Tiffany Perrigan, Tina Young, and Rudolpho Reyes as witnesses at trial. The only one of the witnesses to testify at the post-conviction hearing was Ms. Perrigan. Concerning this issue, the post-conviction court found:

> The Petitioner complains that his trial counsel was ineffective for failing to subpoena witnesses necessary for his defense. The Court considered this complaint as explained by the Petitioner and finds that Tiffany Perrigan would not have provided evidence to exculpate the Petitioner and that the other proposed witnesses could not be located to be subpoenaed for trial. No competent proof was presented to show that this complaint has merit.

> The Petitioner complains that his trial counsel was ineffective for failing to cause a continuance to allow time to locate and subpoena defense witnesses. The Court considered the record and finds that the Petitioner's attorney requested a continuance. The request was denied by the Court. This issue is without merit.

The record does not preponderate against the post-conviction court's findings. First, as to trial counsel's failure to call Rudolpho Reyes and Ms. Young as witnesses, we note that Petitioner did not call Ruldopho Reyes at the post-conviction hearing. Although Petitioner had been advised that Ms. Young was deceased at the time of the post-conviction hearing he offered no proof as to what her alleged testimony would have been at trial. It has long been held that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented at an evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This court may not speculate as to their testimony. *Id*.

As for Ms. Perrigan, her testimony at the post-conviction hearing did not refute the victim's testimony that Petitioner raped him. She admitted that she did not know the victim or anything else about the offense in this case. Ms. Perrigan denied that she and Petitioner had sexual relations in front of the victim, which had been part of the allegations against Petitioner. However, this allegation was not part of the State's proof because trial counsel had successfully moved to have the allegations excluded at trial. Therefore, Petitioner has not demonstrated that he was prejudiced by trial counsel's failure to call Ms. Perrigan as a witness.

- 15 -

Petitioner has also not shown that trial counsel rendered deficient performance in failing to call the witnesses at trial. Trial counsel did not specifically recall when Petitioner provided her with the names of Tiffany Perrigan, Rudolpho Reyes, and Tina Young. She also did not recall that Petitioner articulated why the individuals would be helpful to his case. She testified: "I talked with him a decent amount about the witnesses, but I don't remember having a clear understanding of exactly what those individuals would testify to or what he believed they would testify to." Trial counsel noted that she filed a motion to continue the day before trial because Petitioner provided the names of the potential witnesses very close to the trial date, and an investigator from the public defender's office had tried to locate the witnesses but was unable to do so. Therefore, they requested additional time to locate the witnesses. The motion to continue was denied. Trial counsel testified that the investigator "went out and physically tried to locate these people. In addition to that, I remember that the jail allowed me to access (Petitioner's) cell phone and I had told him that they were going to do that, and so I was able to look through this phone and try to find numbers." Trial counsel did not find the phone numbers for Tiffany Perrigan, Tina Young, or Rudolpho Reyes in Petitioner's phone.

It appears from the record that trial counsel made reasonable attempts to locate Ms. Young, Rudolpho Reyes and Ms. Perrigan but was unable to do so based upon a lack of information by Petitioner. Additionally, Ms. Perrigan testified at the post-conviction hearing that when she asked an acquaintance for Rudolpho Reyes' telephone number, she was informed that Rudopho Reyes did not want to be involved in Petitioner's case and did not know anything about the case. Petitioner has failed to prove that trial counsel was deficient in failing to call Ms. Young, Rudolpho Reyes, and Ms. Perrigan as witnesses at trial or that he was prejudiced in any way by the failure to call them as witnesses. Petitioner is again not entitled to relief on this issue.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying Petitioner post-conviction relief.

_____
THOMAS T. WOODALL, JUDGE

- 16 -